## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------x

GREAT POINT PARTNERS, LLC,                          :
                                                    :
                              Plaintiff,            :        Civil Action No._____
                                                    :
              - against -                           :
                                                    :
MEDIATECH, INC.,                                    :
                                                    :
                              Defendant.            :
                                                    :
-------------------------------------------------------------x

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Great Point Partners, LLC, by and through its counsel Morrison Cohen

LLP, and Wiggin and Dana LLP as and for its complaint against defendant Mediatech, Inc.,

alleges as follows:

### Nature of Dispute

1.      This is an action to recover costs and expenses incurred by Great Point

Partners, LLC ("Great Point") in connection with a potential, but unconsummated, investment

transaction between Great Point and defendant Mediatech, Inc. ("Mediatech").  Pursuant to a

letter agreement dated April 14, 2010, Mediatech is required to reimburse Great Point for its

costs and expenses incurred in connection with the potential investment, whether the investment

closed or not.  When the investment failed to close, Great Point demanded reimbursement of its

costs and expenses of $861,109.46; however, to date Mediatech has failed and refused to pay any

of the sums due to Great Point.

## The Parties

2.      Plaintiff Great Point Partners, LLC is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.

3.      Defendant Mediatech is a Virginia Corporation with its principal place of business in Manassas, Virginia.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) as the parties are citizens of different states and the amount in controversy exceeds $75,000.

5.      Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(a)(2) because the events or omissions giving rise to the claims in this action occurred substantially within the District of Connecticut.

6.      This Court has personal jurisdiction over defendant Mediatech pursuant to Conn. Gen. Stat. § 33-929(f), because, among other things: Mediatech purposefully availed itself of the Connecticut forum by soliciting an investment from Great Point in the state of Connecticut; Mediatech purposefully directed the activities that are the subject of this complaint to a citizen of Connecticut, and the complaint arises out of those activities; the contract that is the subject of this litigation was in substantial part made in, and/or was to be performed in, the state of Connecticut; and upon information and belief, Mediatech also has conducted and/or continues to make sales of its products in the state of Connecticut.

## Facts Common to All Claims for Relief

7.     Great Point is an investment firm, focusing primarily upon investments in healthcare-related companies.

8.     Mediatech is a privately-held company that manufactures and supplies cell culture and molecular biology reagents to biopharmaceutical, academic and government research facilities.

9.     On or about April 14, 2010, Mediatech and Great Point entered into a letter agreement pursuant to which Great Point was to lead a proposed investment of $22 million into Mediatech in accordance with the terms and conditions set forth therein and provided that certain conditions were met (the "Agreement"). A copy of the executed Agreement is attached as Exhibit 1 and incorporated herein.

10.    The Agreement provides, in pertinent part, that the proposed investment was subject to Great Point's satisfactory completion of business, financial, legal and accounting due diligence (the "Due Diligence").

11.    The Agreement further provides, in a section of the Agreement entitled "Costs and Expenses," that Mediatech would pay all of the costs and expenses incurred by Great Point in connection with the proposed investment, including all Due Diligence costs (the "Costs and Expenses"), whether or not the proposed transaction closed:

> By execution of this letter, [Mediatech] agrees to pay all costs, fees and expenses (including, without limitation, all legal, accounting and consulting fees and disbursements) incurred or to be incurred by [Great Point] in connection with the examination, review, documentation, and/or closing of the transaction proposed in this letter whether or not the proposed transaction ultimately closes.

12.     In addition, the Agreement provides that Mediatech is required to indemnify and hold Great Point harmless from any losses or liabilities arising out of the Agreement, including any breaches of the Agreement.

13.     Immediately after executing the Agreement with Mediatech, Great Point commenced its Due Diligence process.  Among other things, Great Point engaged attorneys, accountants, management consultants and other professionals to evaluate Mediatech and the transaction proposed in the Agreement.

14.     In the course of Great Point's Due Diligence, Mediatech's CEO, James DeOlden, became less and less cooperative with Great Point, failed to return telephone calls and messages from Great Point, and declined to respond to a Great Point letter requesting that he reconfirm certain terms of the parties' Agreement.

15.     Moreover, as a result of its Due Diligence, Great Point determined that Mediatech's management had substantially overstated the value of Mediatech, and that Mediatech's actual value could not justify the investment in Mediatech at the price level that was contemplated by the Agreement.

16.     On or about June 25, 2010, Great Point informed Mediatech that the transaction would not proceed because Mediatech had abandoned the transaction, had declined to fully cooperate in the Due Diligence process, and had materially overstated the value of Mediatech.

17.     On or about July 21, 2010, Great Point demanded that Mediatech reimburse Great Point for its Costs and Expenses pursuant to the Agreement in the amount of $861,109.46.  A copy of Great Point's July 21, 2010 letter is attached as Exhibit 2.

18.     Despite Great Point's demand, Mediatech has refused to date to reimburse any portion of Great Point's Costs and Expenses, and has caused Great Point to incur significant additional expense to recover its Costs and Expenses.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

19.     Each of the allegations contained in paragraphs 1 through 18 above is repeated, realleged and incorporated by reference as if set forth fully herein.

20.     The Agreement provides that Mediatech must reimburse Great Point for its Costs and Expenses incurred in connection with the transaction contemplated by the Agreement, whether or not that transaction closes.

21.     The Agreement further provides that the reimbursement of Great Point's Costs and Expenses was a binding contractual obligation of Mediatech, regardless of whether the parties negotiated definitive documentation for the contemplated transaction.

22.     In connection with the contemplated transaction, Great Point incurred substantial Costs and Expenses including fees for attorneys, accountants, consultants and other professionals, all as expressly contemplated by the Agreement.

23.     Despite due demand for payment of Great Point's Costs and Expenses, Mediatech has failed and refused to reimburse any portion thereof.

24.     Mediatech's refusal to reimburse Great Point's Costs and Expenses constitutes a breach of the Agreement.

25.     As a consequence of Mediatech's breach of contract, Great Point has suffered damages in an amount to be determined at trial, but believed to exceed $861,109.46, plus Great Point's reasonable costs to collect the Costs and Expenses.

## SECOND CAUSE OF ACTION
### (MISREPRESENTATION)

26.     Each of the allegations contained in paragraphs 1 through 25 above is repeated, realleged and incorporated by reference as if set forth fully herein.

27.     In connection with the negotiation and execution of the Agreement, Mediatech's management (by and through James DeOlden, its CEO) made representations of fact concerning Mediatech's operations and financial performance, including but not limited to the following:

a)      That Mediatech's fiscal year 2009 EBITDA was at least $3.9 million, and management believed it was as high as $4.8 million with adjustments;

b)      That Mediatech had in place strict quality control practices to ensure compliance with FDA regulations governing manufacturing practices; and

c)      That Mediatech was not subject to any significant claims by third parties.

28.     Great Point's Due Diligence later confirmed that each of these statements of fact was false at the time it was made, and was known to be false by Mediatech's management, including Mr. DeOlden.  In fact:

a)      Mediatech's 2009 EBITDA was no greater than $3.5 million;

b)      Mediatech's manufacturing operations were subject to lax oversight and materially non-compliant with FDA regulatory requirements; and

c)      One of Mediatech's major customers had asserted substantial claims against Mediatech for defective products in January 2010, and sued Mediatech for $10 million shortly after the Agreement was executed.

29.     Each of the foregoing misstatements of fact was deliberately made for the purpose of inducing Great Point to enter into the Agreement and to make an investment in Mediatech as contemplated therein.

30.     Great Point reasonably relied on the misstatements of fact and entered into the Agreement, and thereafter engaged attorneys, accountants, management consultants and other professionals to evaluate Mediatech and conduct Due Diligence concerning the transaction proposed in the Agreement.

31.     As a result of Mediatech's willful misrepresentations of fact, Great Point has been damaged in an amount to be determined at trial, but estimated to be $861,109.46, plus Great Point's reasonable costs to collect the Costs and Expenses.

32.     Because Mediatech's actions were willful, wanton, and in gross disregard of Great Point's rights, Great Point is entitled to an award of punitive damages in the amount of $2 million.

## THIRD CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

33.     Each of the allegations contained in paragraphs 1 through 32 above is repeated, realleged and incorporated by reference as if set forth fully herein.

34.     In connection with the negotiation and execution of the Agreement, Mediatech's management (by and through James DeOlden, its CEO) made several representations of fact concerning Mediatech's operations and financial performance, including but not limited to the following:

        a)     That Mediatech's fiscal year 2009 EBITDA was at least $3.9 million, and management believed it was as high as $4.8 million with adjustments;

       b)      That Mediatech had in place strict quality control practices to ensure compliance with FDA regulations governing manufacturing practices; and

       c)      That Mediatech was not subject to any significant claims by third parties.

35.      Mr. DeOlden was under a duty to use reasonable care in providing truthful and accurate information to Great Point about Mediatech during the course of his dealings with Great Point.

36.      Mr. DeOlden failed to utilize reasonable care and as a result supplied materially false and inaccurate information concerning Mediatech.  Ultimately, Great Point's Due Diligence established that several of Mr. DeOlden's statements of fact were false, including:

       a)      Mediatech's 2009 EBITDA was no greater than $3.5 million;

       b)      Mediatech's manufacturing operations were subject to lax oversight and materially non-compliant with FDA regulatory requirements; and

       c)      One of Mediatech's major customers had asserted substantial claims against Mediatech for defective products in January 2010, and sued Mediatech for $10 million shortly after the Agreement was executed.

37.      Each of the foregoing misstatements of fact was negligently made.

38.      Great Point reasonably relied on the negligent misstatements of fact and entered into the Agreement, and thereafter engaged attorneys, accountants, management consultants and other professionals to evaluate Mediatech and conduct Due Diligence concerning the transaction proposed in the Agreement.

39.      As a result of Mediatech's negligent misrepresentations of fact, Great Point has been damaged in an amount to be determined at trial, but estimated to be $861,109.46, plus Great Point's reasonable costs to collect the Costs and Expenses.

## Demand for Trial by Jury

40.     Pursuant to Fed. R. Civ. P 38, trial by jury of all claims so triable is hereby demanded.

Wherefore, Great Point demands judgment jointly and severally against Mediatech as follows:

(a)     on its first cause of action, damages in an amount to be determined at trial, but estimated to exceed $861,109.46, plus pre-judgment interest and reasonable collection costs;

(b)     on its second cause of action, damages in an amount to be determined at trial, but estimated to exceed $861,109.46, plus pre-judgment interest and reasonable collection costs and punitive damages in the amount of $2 million;

(c)     on its third cause of action , damages in an amount to be determined at trial, but estimated to exceed $861,109.46, plus pre-judgment interest and reasonable collection costs; and

(d)     such other and further relief as the Court deems just and proper.

Respectfully submitted,

GREAT POINT PARTNERS, LLC,

By: _____
James I. Glasser CT07221
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
265 Church Street
New Haven, CT 06508-1832
Tel: 203-498-4313
Fax: 203-782-2889
Email:jglasser@wiggin.com

By: _____
Donald H. Chase (CT23217)
David A. Piedra (CT405233)
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
Tel:  (212) 735-8775
Fax:   (212) 735-8708
E-mail: dchase@morrisoncohen.com

# EXHIBIT  1

**HIGHLY CONFIDENTIAL**

*Submitted via email to jedeolden@cellgro.com*

April 14, 2010


Mr. James E. DeOlden
Founder & Chief Executive Officer
Mediatech, Inc.
9345 Discovery Boulevard
Manassas, VA, 20109

        CC:    Mr. Bill Fox
                 I-Bankers Securities Incorporated
                 505 Park Avenue, 3rd Floor
                 New York, NY 10022

        CC:    Mr. John Elliott
                 Mediatech, Inc.
                 9345 Discovery Boulevard
                 Manassas, VA, 20109


Dear Jim:

On behalf of everyone at Great Point Partners, LLC ("GPP"), we want to thank you for continuing to take the time to meet with us to discuss the business and long-term prospects of Mediatech, Inc. (the "Company" or "Mediatech"). Based upon our knowledge of the media industry, the time we have spent with you and your team, and our confidence in your business model, we are very enthusiastic about a potential investment in Mediatech. We view each of our investments as strong business and working alliances with management, and we very much look forward to working together with you and the rest of your team to further build Mediatech into a leader in the industry.

We are in receipt of your letter of March 30, 2010 detailing your 'counter-offer' to our March 18th, 2010 Letter of Intent. We appreciate your taking the time to think through the important aspects of a transaction as well as making clear the needs of your various constituencies. We were able to meet nearly all of your requests and believe this is a transaction that will serve the interests of all parties. Below we will outline a transaction that we are ready to pursue – we hope that we can move forward quickly together toward a Closing.

We would like to emphasize that while the upfront cash consideration and deal structure are very important to any transaction, the majority of your value creation would be realized when the Company achieves its management case goals. Under the management case projections and the deal structure described herein, you would realize ~$128M over the 5-year deal horizon. This includes the Management Milestone Plan, Earn-In Plan and an assumed exit at a multiple consist with our entry multiple. It is sometimes easy to get lost in the details of a negotiation, but we remain very excited about a potential investment in and partnership with Mediatech. We look forward to helping you achieve that value in full.

**Transaction Summary – Key Elements**

- GPP would lead an investment of $22,000,000 into Mediatech.

- The new money invested would take the form of a 10.5% Senior Redeemable Convertible Preferred Security (the "Convertible Preferred Stock", see attached term sheet for detail).

  ➤ As the attached term sheet outlines, if the Company has achieved the Management Milestone Plan for each of the 3 years following the Closing Date then the Company will have the right, within 90 days of the third anniversary of the Closing Date, to redeem up to half of the Redeemable Preferred Stock at the Liquidation Preference.

- The Convertible Preferred would have a conversion price of $10.00 per share, which values the Company at an Enterprise Value of ~$53.1 million.

  ➤ Considering the 2009 adjusted EBITDA of $3.9 million, we believe a 13.6x valuation is more than fair. In addition we have provided for substantial Earn-In and Management Milestone Plan incentives (described more fully below) to provide significant additional value as the Company realizes on the promise of substantial future growth.

- The following charts outline the calculation of Enterprise Valuation at $10.00 per share as well as Sources and Uses:

| Enterprise Valuation at $10.00/share | |
|---|---|
| Price Per Share | $10.00 |
| Total Share Count | 3,114,517 |
| Equity Valuation | $31,145,174 |
| Debt on Hand | $17,000,000 |
| Cash for Normalization of Extended Payables | $1,700,000 |
| Cash for Normalization of Cap Ex | $400,000 |
| Cash for Fees/Exp. to complete a transaction | $2,900,000 |
| Implied Enterprise Value | $53,145,174 |
| EV/2009 Adj. EBITDA $3.9M | 13.6x |

| Sources and Uses | |
|---|---|
| New Money | $22,000,000 |
| Mr. John Elliott | $9,000,000 |
| Mr. Jim DeOlden - CEO | $4,500,000 |
| Others Sellers | $987,000 |
| Fees and Expenses | $2,900,000 |
| Cost to Normalize WC/CapEx | $2,100,000 |
| Cash to BB&T | $1,500,000 |
| Cash to Balance Sheet | $1,013,000 |
| | $22,000,000 |

- The following chart outlines the shares purchased/sold in the transaction and the pro forma ownership:

| | Current Capitalization | | Shareholder Liquidity and New Investment | | | Fully Diluted | |
|---|---|---|---|---|---|---|---|
| | Shares | % | Price per share | Shares Bought/(Sold) | Cash to/(from) | FD Shares | FD % |
| GPP & Co-Investors | | | $10.00 | 2,200,000 | ($22,000,000) | 2,805,000 | 69.9% |
| **Initial Investors** | | | | | | | |
| James DeOlden | 1,144,584 | 36.7% | | | | - | 18.9% |
| John Elliott | 1,144,584 | 36.7% | $10.00 | (1,144,584) | ($9,000,000) | - | 0.0% |
| Baxter | 526,316 | 16.9% | | | | 526,316 | 14.3% |
| Initial Investors | 56,250 | 1.8% | | | | 56,250 | 1.6% |
| DeOlden, J.D. | 12,500 | 0.4% | $20.00 | (12,500) | ($250,000) | - | 0.0% |
| DeOlden, M. | 12,500 | 0.4% | $20.00 | (6,250) | ($125,000) | 6,250 | 0.2% |
| Wong | 5,556 | 0.2% | | | | 5,556 | 0.2% |
| **Current employees** | | | | | | | |
| Thompson | 29,600 | 1.0% | $20.00 | (14,800) | ($296,000) | 14,800 | 0.4% |
| Titus | 31,600 | 1.0% | $20.00 | (15,800) | ($316,000) | 15,800 | 0.4% |
| Elliott, L. | 10,000 | 0.3% | | | | 10,000 | 0.3% |
| **Former employees** | | | | | | | |
| Laufer | 77,000 | 2.5% | | | | 77,000 | 2.1% |
| Katoen | 6,500 | 0.2% | | | | 6,500 | 0.2% |
| Boyle | 12,000 | 0.4% | | | | 12,000 | 0.3% |
| McCarthy | 15,000 | 0.5% | | | | 15,000 | 0.4% |
| Lakey | 10,000 | 0.3% | | | | 10,000 | 0.3% |
| Swanson / others | 20,527 | 0.7% | | | | 20,527 | 0.6% |
| **Total Mediatech** | 3,114,517 | 100.0% | | | | 3,870,583 | 100.0% |

2

**Transaction Summary – Key Elements (continued)**

> **The Management Milestone Plan**: At Closing, the Company will create a Management Milestone Plan to fully compensate key employees for the value created by future growth in the business. Due to the transaction delays, we are willing to calculate the EBITDA targets based on calendar years beginning on March 1 (i.e. the 2010 targeted EBITDA will be calculated based on the Company performance from March 1, 2010 through February 28, 2011). This will give management a better chance of achieving the high end of these targets.  The following chart details the Management Milestone plan:

| Milestone Plan for Management | Milestone Earned ($s in Millions) | | | | EBITDA Trigger | | |
|---|---|---|---|---|---|---|---|
| | Low | Middle | High | | Low | Middle | High |
| 1st 12 Months | $0.8 | $2.5 | $5.0 | To be paid in common stock at fair value* | $7.0 | $7.9 | $10.6 |
| 2nd 12 Months | $0.9 | $2.8 | $5.5 | To be paid in common stock at fair value* | $8.1 | $9.1 | $13.2 |
| 3rd 12 Months | $1.0 | $3.0 | $6.0 | Stock at fair value* or cash at mgmt option | $9.3 | $10.4 | $16.5 |
| 4th 12 Months | $1.1 | $3.3 | $6.5 | Stock at fair value* or cash at mgmt option | $10.6 | $12.0 | $20.6 |
| 5th 12 Months | $1.2 | $3.5 | $7.0 | Stock at fair value* or cash at mgmt option | $12.2 | $13.8 | $25.8 |
| | $5.0 | $15.0 | $30.0 | | | | |
| | Payments will be linear in between targets | | | Fair Value = Entry Multiple (13.6x) * EBITDA - Net Debt | | | |

> Given the potentially large milestones and the Company's need for growth capital, milestones earned in years 1 and 2 of the plan will be paid in additional stock issued at Fair Value.

> In year 3, the Company will have the option to use a portion of the liquidity from the Management Milestone Plan to repurchase shares from existing shareholders, offered on a pro rata basis at a fair and reasonable price per share.

> In years 4-5 of the plan, management shall have the option to elect for either additional stock at Fair Value or cash payments form the Company.

- **The Earn-In Plan**: Following the 12 months of operations ending February 28, 2011, EBITDA for those twelve months will be calculated.  The Company will issue 15%, 20% or 25% in management incentives if the 12 months of EBITDA are greater than $6,000,000, $8,000,000 or $10,000,000 respectively.  Mr. DeOlden, the new Chief Operating Officer, and other management will be allocated 60%, 20% and 20% of the plan respectively.  The following chart outlines the effect of the Earn In Plan:

| Earn-In Plan | | | Earn In Plan Based on First 12 Months EBITDA | | |
|---|---|---|---|---|---|
| Pro Forma Fully Diluted | At Close | At Close | $6M | $8M | $10M |
| GPP & Affiliates | 2,200,000 | 59.8% | 50.9% | 47.9% | 45.0% |
| James DeOlden | 664,664 | 18.0% | 15.3% | 17.1% | 26.2% |
| Baxter | 526,316 | 14.3% | 12.2% | 11.5% | 10.8% |
| Initial Investors | 56,250 | 1.5% | 1.3% | 1.2% | 1.1% |
| DeOlden, M. | 6,250 | 0.2% | 0.1% | 0.1% | 0.1% |
| Wong | 5,556 | 0.2% | 0.1% | 0.1% | 0.1% |
| Thompson | 14,800 | 0.4% | 0.3% | 0.3% | 0.3% |
| Titus | 15,800 | 0.4% | 0.3% | 0.3% | 0.3% |
| Elliott, L. | 10,000 | 0.3% | 0.2% | 0.2% | 0.2% |
| Laufer | 77,000 | 2.1% | 1.8% | 1.7% | 1.6% |
| Katoen | 6,500 | 0.2% | 0.2% | 0.1% | 0.1% |
| Boyle | 12,000 | 0.3% | 0.3% | 0.3% | 0.2% |
| McCarthy | 15,000 | 0.4% | 0.3% | 0.3% | 0.3% |
| Lakey | 10,000 | 0.3% | 0.2% | 0.2% | 0.2% |
| Swanson / others | 20,527 | 0.6% | 0.5% | 0.4% | 0.4% |
| New COO | | | 3.0% | 4.0% | 5.0% |
| Other Mgmt | | | 3.0% | 4.0% | 5.0% |
| Total Mediatech | 3,670,563 | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| Mgmt Incentives (half stock, half options) | | | 15% | 20% | 25% |
| Total New Fully Diluted Shares Issued | | | 647,750 | 917,646 | 1,223,528 |
| Total Fully Diluted Share Count Upon New Issue | | | 4,318,333 | 4,588,229 | 4,894,111 |
| | | | | | |
| 60% to Mr. DeOlden | | | 388,650 | 550,587 | 734,117 |
| 20% to New Chief Operating Officer | | | 129,550 | 183,529 | 244,706 |
| 20% to Other Management | | | 129,550 | 183,529 | 244,706 |

3

**Transaction Summary – Key Stakeholders**

Mr. Jim DeOlden

- The Company would purchase from Mr. DeOlden 450,000 of his 1,144,584 shares of common stock at a price of $10.00 per share for a total of $4,500,000 in cash at Closing.

- Mr. DeOlden would be allocated 60% of the new options and stock grants under the "Earn-In" plan. Depending on the level of performance achieved, this will raise Mr. DeOlden's pro forma ownership stake from 18.9% at Closing up to a maximum of 29.2%. The Earn-In Plan is more fully outlined above.

- Mr. DeOlden would be allocated 80% of the "Management Milestone" plan. If the management case is achieved, Mr. DeOlden will earn $24,000,000 of milestones over the next five years from this plan. If a lower case is achieved, Mr. DeOlden will still have the opportunity to earn significant milestones as more fully outlined above.

  ➢ Please note GPP does not specifically guarantee payments under the plan as requested. The plan is the responsibility of Mediatech, of which GPP will be the majority shareholder.

- The Company and Mr. DeOlden would sign a 3-year employment agreement at Closing, the key terms would be:

  ➢ Minimum base salary of $550,000 and a title of Chief Executive Officer. Annual raises will be at the discretion of the Compensation Committee of the Board of Directors of the Company.

  ➢ Additional Quarterly Cash Bonus payments to be calculated roughly as requested in your counter offer; quarterly payments equal to (a) 13% multiplied by (b) the actual EBITDA margin achieved in the quarter, multiplied by (c) the increase in net sales in the quarter relative to the same period one year prior minus (d) $12,500 (annualized $50,000 reduction in correspondence with the increase from $500K to $550K in base salary). For example: a payment of $65,500 would be due following Q3 2010 if Q3 2010 net sales were $10M, Q3 2009 net sales were $7M and actual EBITDA margin in Q3 2010 were 20% ($10M - $7M = $3M x 20% = 600K x 13% = $78,000 - $12,500 = $65,500). Assuming 4 quarters of similar performance, total annual cash compensation would equal $812,000.

    ▪ In addition to the Management Milestone Plan, the Earn In Plan and the Quarterly Cash Bonus which provides up to $5,000,000 in milestones, up to 25% of the Company in stock and options and unlimited cash bonuses based on sales and EBITDA growth, you have requested a "super bonus" for you and 3 other employees for the first 12 months following Closing to be calculated as 100% of EBITDA beyond management case performance ($40M in sales and $10.6M in EBITDA). While we think this is excessive, we will agree to provide for a one-time "super bonus" at the rate of 50% of EBITDA beyond Management Case projection of $10.6M in EBITDA for the 12 months ending February 28, 2011.

  ➢ We have reviewed your draft employment contract preliminarily and note the following:

    ▪ We agree that for so long as Jim remains CEO, Jim would have a seat on the Board of Directors. At Closing, Jim will have a 3-year veto right on a strategic sale of the Company to a predetermined list of 5 companies.

    ▪ As requested, we agree that the termination provision will include a minimum of 1 year severance regardless of cause. Moreover, we agree that if Mr. DeOlden is terminated without cause, Mr. DeOlden will be due severance in an amount equal to the remaining salary and cash bonuses due under the contract.

    ▪ The following items will need to be detailed but we do not expect them to be problematic: (i) Reasonable use of a car, (ii) medical insurance, and (iii) vacation days.

    ▪ The following items require further discussion as we do not expect them to be part of the ongoing company: (i) life insurance, (ii) pension benefits and (iii) 1% quarterly stock sale program.

    ▪ Non-Competition and Non-Solicitation clauses shall mirror the termination provisions (i.e. a minimum of 1 year and up to 3 years if you leave voluntarily without cause or have been terminated but are being compensated through the full duration of your contract).

4

<u>Mr. John Elliott</u>

- The Company would purchase from Mr. Elliott 100% of his 1,144,584 shares of common stock at Closing.   In consideration for his shares John will receive:
  - ➤ $9,000,000 of cash at closing.
  - ➤ $1,160,000 of Redeemable Preferred Stock as described below.
  - ➤ A $100,000 per year cash payment from the Company to fund life insurance premiums.  This payment will be made until the earlier to occur of (i) John's death or (ii) 20 years from Closing.
- The $1,160,000 Redeemable Preferred Stock will be redeemed in eight equal installments of $145,000 each to be made quarterly following Closing. ~~The Company will have the right to defer payment of any redemption payment if it has insufficient cash on hand at the time the payment is due or if the Company has year-over-year declines in EBITDA.~~
- GPP would negotiate with BB&T for John to be relieved of his $5,000,000 personal guarantee.
- The following chart outlines the total value received by John Elliott using the Company's cost of debt as a discount rate:

| Implied Stock Price for Mr. John Elliott | | |
|---|---|---|
| Cash | | $   9,000,000 |
| NPV of Preferred Stock | 4.05% | 1,093,152 |
| NPV of Life Insurance | 4.05% | 1,353,035 |
| Total | | $  11,446,187 |
| Current # of Shares | | 1,144,584.4 |
| *Implied Price per Share* | | $   10.00 |

<u>New Senior Manager</u>

GPP believes that Mediatech has a strong management team in place and those individuals will continue to be critical to the Company.  However, in order to unlock the maximum value potential of Mediatech, GPP believes a professional manager should be recruited and will benefit all stakeholders.  Over time this individual would act as a potential successor to Jim as the CEO of the Company; our initial thinking is that this transition could take place over approximately 1-3 years.  GPP would leverage its extensive network, and possibly a profession executive search firm, to recruit the best possible Chief Operating Officer to help run Mediatech.  We believe the opportunity is exceptional and therefore we expect to attract multiple exceptional candidates.  A sub-committee of the Board of Directors, of which Mr. Deolden will be a member if he chooses, will launch the search immediately post Closing.

<u>Other Selling Shareholders</u>

We understand that 4 existing shareholders would like to sell 49,350 shares as part of this transaction.  We further understand that you would like this to be done at $25.00 per share, substantially above the fair market value.  We are willing to have the Company purchase these shares at Closing, however, we believe that given the cash constraints involved, a price per share of $20.00 is more appropriate, and still extremely generous as it implies an Enterprise Value of ~$85 million.

<u>Other Items</u>

- The Company would enter into a standard management services agreement with GPP, which would include an annual management fee equal to the greater of 5% of EBITDA or $500,000, but not to exceed $750,000 per year.
- GPP has assumed that there would be $17 million of debt at closing pre-funding and that a normal level of working capital in the business. GPP has further assumed that the $17M of debt has an annual cost of 4.05% and that the facility is long term in nature and would remain in place as part of this transaction with any amendments necessary to permit the transactions contemplated herein not to result in any increased cost to the Company.
  - ➤ We expect that the existing covenant defaults on the BB&T debt facilities would be waived as part of this Financing and that covenants and liquidity would be renegotiated in form and substance satisfactory to us.
  - ➤ As shown below, GPP expects to pay down ~$1.5 million of the existing revolver at Closing and provide for at least $1 million in cash on hand in addition.

5

- The Board will seriously consider an IPO of the business if certain metrics are attained and market conditions permit. We believe that various liquidity alternatives will be available to the Company as it executes on its growth objectives and each alternative should be evaluated carefully. An IPO is often a very attractive alternative if and when capital markets are strong and receptive to businesses of this size.

## Conditions to Closing

Our proposal is conditioned upon the following items:

- *Due Diligence*. While we have visited the Company and met with Management and have conducted preliminary due diligence, our definitive offer and our entering into detailed definitive documents for the proposed transaction are conditioned upon the satisfactory completion of our business, financial, legal and accounting due diligence, and the results of our due diligence being satisfactory to us. We expect this process to take approximately four weeks from commencement, and to include, among other things: a detailed financial analysis, additional market and personal reference checks, customer calls, a business review of the Company by a nationally recognized accounting firm, legal and tax due diligence, a consulting review of the market and the Company's manufacturing facility as well as additional meetings with Management.

- *Material Adverse Change*. There shall exist no change in the Company or the markets which would have a material adverse impact on its business, condition (financial or otherwise), value, prospects or assets since the date of the most recent audited financial statements.

- *Documentation*. The Company's by-laws and certificate of incorporation shall be amended to our satisfaction, and detailed definitive purchase (including customary representations and warranties, covenants, closing conditions, and indemnities from the selling stockholders for pre-Closing liabilities), shareholder, registration rights (investor rights), and other agreements necessary to provide GPP with the rights described in this letter and in the attached term sheet, shall have been negotiated, executed and delivered, in each case in form and substance satisfactory to us.

- *Conduct of Business*. Prior to closing, the Company will conduct its business only in the normal course. In addition, the Company's shareholders will do nothing which could impair the value of the Company's business, and there will be no extraordinary payments, transactions, dividends or bonuses made without the consent of GPP.

- *Debt:* Upon the Closing, the existing debt facilities (amended as necessary to permit the transactions contemplated herein) will remain in place and be on terms acceptable to GPP and in the amounts outlined in the Transaction Summary section.

- *Employment Contracts:* Upon the Closing, both you and other key members of management shall sign employment agreements which shall include non-competition clauses.

## Costs & Expenses

By execution of this letter, the Company agrees to pay all costs, fees and expenses (including, without limitation, all legal, accounting and consulting fees and disbursements) incurred or to be incurred by GPP in connection with the examination, review, documentation, and/or closing of the transaction proposed in this letter whether or not the proposed transaction ultimately closes.

## Exclusivity

By signing this letter you agree that you will deal exclusively with GPP on this proposed transaction and will end discussions with all other potential investors in the Company beginning on the date that you countersign this agreement and continuing through May 28, 2010 (the "Exclusivity Period"). GPP and its affiliates will be granted access to the Company's books, records and personnel for the purpose of conducting a thorough due diligence investigation, and GPP and the Company agree to negotiate promptly, continuously and in good faith up to and including the closing date. If any financing

6

or other transaction which is substantially similar to the transaction proposed herein is closed within one year from the end of the Exclusivity Period, without GPP participating in such financing, and GPP is prepared to consummate the proposed financing on substantially the same terms set forth herein, then an Opportunity Cost Fee of $1,000,000 shall be paid to GPP by the Company.

**Indemnification**

By executing this letter, the Company agrees, regardless of whether or not the proposed transaction is ultimately completed, to indemnify and hold harmless GPP, its respective affiliates and each of their respective partners, officers, directors, representatives, employees and agents, from and against all and any losses, claims, damages, and liabilities resulting from or arising out of: (i) this letter or the transactions proposed hereby (including without limitation any breaches of this letter), or (ii) any litigation, investigation or proceeding initiated or brought by any third party (other than any affiliate, partner, officer, director, agent, employee or representative of GPP) relating hereto or thereto, and to reimburse upon demand each of such indemnified parties currently and from time to time for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not apply to any losses, claims, damages, liabilities or related expenses to the extent a court of competent jurisdiction shall have determined in a final judgment that is not subject to further appeal that the foregoing shall have resulted primarily and directly from the willful misconduct or gross negligence of any indemnified party.

**Public Disclosure**

GPP and the Company jointly will agree on the timing and content of any disclosure relating to GPP's investment in the Company prior to its initial public dissemination, and no such disclosure shall be made without our consent and the consent of the Company. Prior to any such dissemination, our identity and interest in the Company shall not be disclosed by the Company or any of its advisors.

**Indication of Interest Only**

It is understood that this letter and the attached Term Sheet constitute only an indication of interest with respect to an investment in the Company and do not constitute a legally binding commitment or agreement by us. A legally binding agreement for the transactions contemplated herein can only be entered into following the negotiation, execution and delivery of a detailed definitive purchase agreement (including customary representations, warranties, covenants, conditions and indemnities) and related shareholder and ancillary documentation necessary to provide GPP with the rights described herein and in the attached Term Sheet (in each case, in form and substance satisfactory to us). Notwithstanding the preceding two sentences, the provisions under the "Costs & Expenses," "Exclusivity," "Public Disclosure" and "Indemnification" shall be legally binding on GPP and the Company.

**Timing / Next Steps**

This letter constitutes a proposal based on information that we have received to date with respect to our potential investment in Mediatech. We are prepared to dedicate our firm's resources and to move forward quickly towards finalizing a GPP investment with you and the rest of the management team at Mediatech. We are ready to work with you on an expedited basis and believe that we can be in a position to conduct and complete our due diligence and, subject to the provisions and conditions outlined above under "Conditions to Closing" and "Indication of Interest Only," sign definitive documents and close the proposed transaction by May 28th, 2010 as long as this letter agreement is signed and returned to us by April 15th, 2010.

7

**Expiration of GPP's Proposal**

This letter will expire at 5:00 p.m. on April 15th, 2010, unless this letter has been agreed to, accepted and executed by the Company and received by the undersigned care of GPP at the address set forth above by such time and date.

We look forward to discussing this letter with you and to completing an investment in Mediatech that will accomplish the goals that you have set forth for your former partner, for yourself and for all of the hard working employees at Mediatech. The entire GPP team is enthusiastic about making an investment in Mediatech.

Very truly yours,

Great Point Partners, LLC

By: _____   Date: _April 15, 2010_
      Mr. David E. Kroin

Title: _Managing Director_____

Agreed to and Accepted by:

_Mediatech, Inc._

By: _____   Date: _April 15, 2010_
      Mr. James DeOlden

Title: _____

Agreed to and Accepted by:

_Mr. John Elliott_

By: _____   Date: _April 15, 2010_
      Mr. John Elliott

Title: _____

8

## Redeemable Convertible Preferred Stock Term Sheet*

| | |
|---|---|
| **Issuer:** | Mediatech, Inc. (the "Company" or "Mediatech") |
| **Investors:** | Great Point Partners, LLC (together with its affiliated investment funds, "GPP") and one or more co-investors that are mutually acceptable to GPP and the Company (collectively, the "Co-Investor"). GPP and the Co-Investor shall sometimes collectively be referred to as the "Investors". |
| **Issue/Security:** | Series A Redeemable Convertible Preferred Stock (the "Convertible Preferred Stock") |
| **Amount of Issue:** | $22,000,000 |
| **Price:** | $10.00 per share of Convertible Preferred Stock. |
| **Dividend:** | A cumulative 10.5% per annum dividend, compounding quarterly and accruing daily beginning on the closing date of the financing. Accrued and unpaid dividends shall be payable in cash upon a Liquidity Event (which shall be defined as a sale, merger, liquidation or IPO of the Company) or a Redemption (defined below). |
| **Seniority:** | The Convertible Preferred Stock and Redeemable Preferred Stock (as defined under "Conversion" below) shall rank pari passu as to each other and senior to all other capital stock, in each case with respect to dividend rights and liquidation preference. |
| **Liquidation Preference:** | Upon any liquidation, dissolution or winding-up of the Company, holders of the Convertible Preferred Stock will have the right to receive prior to and in preference over any liquidation payment on any other capital stock, an amount equal to the amount which the holders would be entitled to receive if the Convertible Preferred Stock were converted into a Conversion Unit (as defined under "Conversion" below) immediately before such liquidation, dissolution or winding up. An Liquidity Event shall be deemed to be a liquidation for purposes of payment of the Liquidation Preference unless a majority of the shares of the Convertible Preferred Stock determine otherwise. |
| **Conversion:** | Each share of Convertible Preferred Stock shall be convertible at any time at the election of each holder into a unit (a "Conversion Unit") consisting of (i) one share of Redeemable Preferred Stock (the "Redeemable Preferred Stock") and (ii) that number of shares of Common Stock ("Common Stock") determined by dividing an amount equal to $22,000,000, plus any accrued and unpaid dividends thereon (the "Liquidation Preference") by an amount equal to the adjusted conversion price (which shall initially be $10.00 (as defined in Price above), but shall be subject to adjustment as described under "Anti-Dilution"). The Redeemable Preferred Stock shall have an aggregate initial liquidation preference equal to $22,000,000. Automatic Conversion will occur upon the earlier to occur of (x) an initial public offering of Common Stock, and (y) a Liquidity Event. The Common Stock into which the Convertible Preferred Stock is convertible shall initially represent 59.9% of the Company's fully diluted capitalization. |
| **Redemption:** | Each issued and outstanding share of the Redeemable Preferred Stock shall be redeemed on the earlier of (x) May 28, 2017 and (y) a Liquidity Event. The redemption price per share shall be equal to the Liquidation Preference per share. |

If the Company has achieved the maximum thresholds in the Management Milestone Plan for each of 3 years following the Closing Date, then the Company will have the right, within 90 days after the third anniversary of the Closing Date, to redeem up to half of the Redeemable Preferred Stock at the Liquidation Preference.

**Anti-Dilution:** The Convertible Preferred Stock terms will contain customary anti-dilution adjustments for structural events such as stock splits, stock dividends, combinations, etc., as well as customary weighted average anti-dilution protection with respect to issuances of capital stock (including options, warrants, convertible securities, etc.) at a price per share which is lower than the adjusted conversion price or the then current market value per share for the Common Stock. Customary carveouts from such anti-dilution provisions will include stock options (and stock issued upon the exercise of such options) issued pursuant to the new stock option and bonus plan described below.

**Board Representation:** GPP will have the right to designate 4 members of the Company's Board of Directors including the Chairman. The Board will consist of 5 members as follows: (1) 3 representatives of GPP; (2) James DeOlden; and (3) 1 independent director with industry expertise who shall be designated by GPP but will be mutually agreed upon by Management, with such agreement not to be unreasonably withheld. One or more of the GPP representatives also would serve on each of the audit, compensation, financing and, if they exist, executive and nominating committees. The Board shall meet at least quarterly. The Company shall purchase D&O insurance in form and substance satisfactory to GPP within two months from the closing date assuming such insurance is available on customary and commercial terms and pricing. GPP will also be reimbursed for reasonable travel expenses to Board Meetings.

**Earn In Plan:** At closing, the Company will establish an earn-in plan pool consisting of 50% restricted stock grants and 50% stock options which combined will equal 25% of the fully diluted shares of the company upon issuance. The pool will be allocated to members of management in a mutually agreeable format but initially the framework shall be, 60% to James DeOlden and 40% to other members of management. All options will be issued at the Conversion Price of the Convertible Preferred Stock and all options and stock grants will be subject to 5 year vesting, such vesting to accelerate upon a Liquidity Event. The pool shall be earned and issued as follows:

- 60% if, and only if, 2010 audited EBITDA (subject to add-backs to be mutually agreed upon) is at least $6,000,000
- An additional 20% if, and only if, 2010 audited EBITDA (subject to add-backs to be mutually agreed upon) is at least $8,000,000
- The remainder if, and only if, 2010 audited EBITDA (subject to add-backs to be mutually agreed upon) is at least $10,000,000

2010 EBITDA will be calculated on a February 28 calendar year (i.e. 2010 performance measured from March 1, 2010 through February 28, 2011) in order to give management a better chance of achieving the high end of the goals.

**Milestone Plan:** At closing, the Company will establish a Management Milestone Plan for up to $30,000,000. The plan will be allocated to members of management in a mutually agreeable format but initially the framework shall be 20% to other management and 80% to James DeOlden The payments shall be earned as follows:

2

| Milestone Payout (in millions) | | | | EBITDA Target | | |
|---|---|---|---|---|---|---|
| | Low | Middle | High | | Low | Middle | High |
| 1st 12 Months | | | | To be paid in common stock at fair value* | $7.0 | $7.5 | $10.5 |
| 2nd 12 Months | $3.0 | $3.5 | $6.0 | To be paid in common stock at fair value* | $8.1 | $9.1 | $13.2 |
| 3rd 12 Months | $1.0 | $3.0 | $9.0 | Stock at fair value* or cash at mgmt option | $9.3 | $10.4 | $16.5 |
| 4th 12 Months | $1.1 | $3.3 | $9.9 | Stock at fair value* or cash at mgmt option | $10.5 | $12.0 | $20.0 |
| 5th 12 Months | $1.2 | $3.6 | $7.6 | Stock at fair value* or cash at mgmt option | $12.3 | $13.8 | $28.0 |

*Payments will be linear in between targets*   *Fair Value = Entry Multiple (13.6x) * EBITDA – Net Debt*

Milestone amounts will be linear in the case of EBITDA levels which fall between the Milestone targets. EBITDA will be calculated on a February 28 calendar year as above. 2010 and 2011 Milestones will be paid in newly issued common stock at Fair Value (13.6 x EBITDA less Net Debt). 2012-2014 Milestones will be paid either in cash or in stock at Fair Value at the recipient's option.

> Given the potentially large milestones and the Company's need for growth capital, milestones earned in years 1 and 2 of the plan will be paid in additional stock issued at Fair Value.

> In year 3, the Company will have the option to use a portion of the liquidity from the Management Milestone Plan to repurchase shares from existing shareholders, offered on a pro rata basis at a fair and reasonable price per share.

> In years 4-5 of the plan, management shall have the option to elect for either stock at Fair Value or cash payments form the Company.

**Registration Rights:** GPP shall have two demand registration rights that can be exercised at anytime after 6 months from the Company's initial public offering, as well as unlimited Form S-3 and Piggyback registration rights. The Company will bear the cost of all registration expenses (other than underwriting discounts and selling commissions).

**Other Rights:** GPP shall be entitled to pre-emptive rights on new issuances, rights of first refusal on resales, co-sale/tag along rights, bring along rights, information and inspection rights, and other rights as are customary for similar types of transactions.

**Information Rights:** The Company will deliver to GPP, within 30 days after each month, monthly and year-to-date financial reports detailing the income statement, balance sheet and cash flow statements of its operations. The income statement will detail performances versus plan and the prior year's performance. The Company will also deliver audited financial statements (audited by a nationally recognized accounting firm) within 90 days of the end of each fiscal year. The Company will also deliver an annual budget, completed at least 30 days prior to the beginning of the fiscal year to which it relates. All financial information will be presented in a consolidated and consolidating format.

**Fees:** $1,250,000 one time structuring fee paid out of the contemplated $2,900,000 in total fees and expenses at closing, plus fees under the GPP standard management services agreement including an annual monitoring fee payable quarterly in arrears equal to the greater of $500,000 per year or 5% of EBITDA, not to exceed $750,000 per year. GPP will provide periodic updates of the services it is providing.

**Costs and Expenses:** Upon the consummation of the transactions contemplated hereby, GPP will be reimbursed by the Company at closing for all out-of-pocket expenses, including without limitation, attorneys', accountants', and consultants' fees, and other due diligence expenses. GPP's counsel shall prepare all purchase and investment related documents.

---

This term sheet does not constitute an offer and is presented solely for discussion purposes. This term sheet shall not be construed as creating any obligations on any party whatsoever, and shall not be binding on any party unless the terms of the proposed investment are ultimately contained within definitive documents which are negotiated, executed and delivered in connection with the closing of such investment.

Received                              Apr 16 2010 06:41am
02/03/2006  12:50  7034714390                    MEDIATECH                      PAGE  01/01
                          Medlatech Inc     Fax 703+471+0369   Apr 15 2010 04:39pm  P001/001

Mr. John Elliot

- The Company would purchase from Mr. Elliot 100% of his 1,144,584 shares of common stock at Closing. In consideration for his shares John will receive:

  > $9,000,000 of cash at closing.

  > $1,160,000 of Redeemable Preferred Stock as described below.

  > A $100,000 per year cash payment from the Company to fund life insurance premiums. This payment will be made until the earlier to occur of (i) John's death or (ii) 20 years from Closing.

- The $1,160,000 Redeemable Preferred Stock will be redeemed in eight equal installments of $145,000 each to be made quarterly following Closing. ~~The Company will have the right to defer payment of any redemption payment if it has insufficient cash on hand at the time the payment is due or if the Company has year over year declines in EBITDA.~~

- GPP would negotiate with BB&T for John to be relieved of his $5,000,000 personal guarantee.

# EXHIBIT  2

# Morrison Cohen LLP

Henry Zangara
Partner
(212) 735–8859
hzangara@morrisoncohen.com

July 21, 2010

**SUBMITTED VIA EMAIL**

Mr. James E. DeOlden
Founder and Chief Executive Officer
MediaTech, Inc.
9345 Discovery Boulevard
Manassas, VA  20109

Re:     Reimbursement of Costs and Expenses

Dear Mr. DeOlden:

I am writing on behalf of my client, Great Point Partners, LLC ("GPP"), in connection with that certain letter agreement, dated April 14, 2010 (the "April 14th Letter"), by and among GPP, MediaTech, Inc. (the "Company"), and Mr. John Elliott.  Given the Company's lack of responsiveness with respect to the transaction set forth in the April 14th Letter (the "Original Transaction"), among other considerations, GPP has made the determination not to continue to pursue the Original Transaction.

To that end, I refer you to the section entitled "Costs and Expenses" in the April 14th Letter, which provides that "the Company agrees to pay all costs and expenses (including, without limitation, all legal, accounting and consulting fees and disbursements) incurred or to be incurred by GPP in connection with the examination, review, documentation, and/or closing of the transaction proposed in this letter whether or not the proposed transaction ultimately closes." GPP hereby formally requests that the Company pay to GPP $861,109.46 as reimbursement for all such costs and expenses (the "Reimbursement Payment") by way of wire transfer of immediately available funds to the account set forth on Schedule I attached hereto.  We are mindful of the Company's current liquidity crisis, and GPP is therefore willing to have the Company pay the Reimbursement Payment in three installments in accordance with the payment plan set forth on Schedule II attached hereto.  Each such cost and expense incurred to date by GPP, along with the supporting invoices therefore, is set forth on Schedule III attached hereto.

In the event that GPP does not receive when due any portion of the Reimbursement Payment in accordance with the payment plan set forth on Schedule II attached hereto, please be aware that GPP will not hesitate to pursue any and all legal remedies at its disposal in order to recover such costs and expenses, including, but not limited to, the commencement of litigation against the Company and one or more of its directors and officers.  Any such litigation would seek recovery of all legal fees and expenses incurred by GPP in pursuing such claim, as well as any

#2364083 v1 \017126 \0072

# MorrisonCohen LLP

Mr. James E. DeOlden
July 21, 2010
Page 2

consequential damages suffered by GPP due to the Company's failure to timely pay when due any portion of the Reimbursement Payment.

This letter is without waiver of any and all of GPP's rights and remedies in this matter, all of which are hereby expressly reserved.

If you have any questions regarding the contents of this letter, please feel free to contact me at the number set forth above.

Respectfully yours,

cc:  James D. DeOlden, Esq.
     David E. Kroin
     Adam B. Dolder

#2364083 v1 \017126 \0072

# MorrisonCohen LLP

Mr. James E. DeOlden
July 21, 2010
Page 3

Schedule I

Wire Instructions

Account Name: Great Point Partners, LLC
Account #: 3300593817
ABA #: 121140399
Bank: SIL VLY BK SJ

# MorrisonCohen LLP

Mr. James E. DeOlden
July 21, 2010
Page 4

Schedule II

Payment Plan

1st Installment: $250,000 due to GPP by way of wire transfer of immediately available funds to the account set forth on Schedule I no later than 5:00pm EST on August 4th, 2010.

2nd Installment: $250,000 due to GPP by way of wire transfer of immediately available funds to the account set forth on Schedule I no later than 5:00pm EST on September 30th, 2010.

3rd Installment: $361,109.46 due to GPP by way of wire transfer of immediately available funds to the account set forth on Schedule I no later than 5:00pm EST on December 31st, 2010.

**Morrison**Cohen<sub>LLP</sub>

Mr. James E. DeOlden
July 21, 2010
Page 5

<u>Schedule III</u>

**PROJECT MOGUL - FEES & EXPENSES SCHEDULE**

| Vendor | $ Amount |
|---|---|
| KPMG - ACCT | 160,000 |
| KPMG - IT | 20,000 |
| KPMG - Tax | 60,000 |
| Morrison Cohen | 202,461 |
| LEK | 208,175 |
| LeClairRyan | 16,859 |
| Environ | 4,013 |
| Gryphon | 3,746 |
| Lockton | 15,000 |
| AccuReg | 26,595 |
| C.V.M. Advisory Group, LLC | 88,934 |
| Out-of-pocket expenses (GPP) | 47,552 |
| Out-of-pocket expenses (Fletcher Spaght) | 7,774 |
| **Total** | **$861,109.46** |



Date:  July 9, 2010

GREAT POINT PARTNERS, LLC
ATTN:  MR. CHARLES MYERS
165 MASON STREET, 3RD FLOOR
GREENWICH, CT 06830

| PLEASE REMIT PAYMENT THROUGH ONE OF THE FOLLOWING METHODS | |
|---|---|
| By mail: | Electronic Funds Transfer: |
| | Invoice Number |
| KPMG LLP | The Bank of New York Mellon |
| Dept. 0691 | 500 Ross Street, Rm. 0940 |
| P. O. Box 120001 | Pittsburgh, PA 15262 |
| Dallas, TX  75312-0691 | ABA# 043000261 |
| | ACCT# 0306931 |
| | SWIFT code number is: |
| | MELNUS3P |

TIN: 13-5565207

| Business Unit: | US115 | Client Number: | 60262473 | Project Number(s): | 12011204 |
|---|---|---|---|---|---|

Professional services in relation to due diligence assistance on Project Virginia.

| | |
|---|---:|
| Financial due diligence | $160,000 |
| Tax due diligence | 60,000 |
| Information technology due diligence | 20,000 |
| **Total Due** | $240,000 |

*KPMG LLP is a Delaware limited liability partnership, the U.S. member firm of KPMG International Cooperative, a Swiss entity.*

Please Enclose Remittance Copy or
Reference Our Invoice# With
Payment

Payment Due
Upon
Receipt

MORRISON COHEN LLP
909 Third Avenue
New York, N.Y. 10022
(212) 735-8600

SERVICES AS OF JULY 14, 2010

017126    GREAT POINT PARTNERS, LLC
0072      MEDIATECH, INC. - PE INVESTMENT

          GREAT POINT PARTNERS, LLC
          185 MASON STREET
          3RD FLOOR
          GREENWICH, CT  06830
          ATTN:  MR. ADAM DOLDER

FEES FOR PROFESSIONAL SERVICES RENDERED during the period beginning on April 7, 2010
and ending on July 14, 2010 in connection with:

(1) Preparation of offer letters, voting agreements, stock purchase agreement, reimbursement letter, option
plans, incentive plans, and other documents; (2) legal due diligence review; (3) analysis of various
transaction structures; and (4) numerous telephone conference calls, e-mails, correspondence and other
means of communication with the client, client's consultants, Virginia counsel, and various
representatives of MediaTech, Inc. regarding the foregoing.

$199,252.92

ESTIMATED DISBURSEMENTS INCURRED IN CONNECTION WITH THE FOREGOING,
INCLUDING WITHOUT LIMITATION, LONG DISTANCE TELEPHONE AND TELEFACSIMILE
CHARGES, PHOTOCOPYING AND MESSENGER SERVICES (DISBURSEMENTS INCURRED IN
EXCESS OF THE ESTIMATED AMOUNT WILL BE BILLED POST-CLOSING).

$   3,208.38

TOTAL FEES AND DISBURSEMENTS ................................................................. $202,461.30

TOTAL NOW DUE ..................................................................................................... $202,461.30

#2356397 v1 \017126 \0072



**L.E.K. Consulting LLC**
28 State Street, 18th Floor
Boston, MA 02109 (USA)
Tax ID#: 04-3313799

Telephone # 617-951-9500
Fax # 617-951-9392

| | |
|---|---|
| Invoice No.: | 013081 |
| Customer ID: | GPT002-00 |
| Terms: | Net 30 |
| Purchase Order: | |
| Document Date: | 6/30/2010 |
| Page: | 1  of  1 |

Adam Dolder
Great Point Partners
165 Mason Street
3rd Floor
Greenwich, CT 06830

| Description | Amount |
|---|---|
| Cell Culture Assessment- Professional Fees | 175,000.00 |
| Variable Costs ( 9% of Fees ) | 15,750.00 |
| Direct Expenses | 17,425.00 |
| Database- $4685 | |
| Interviews/Surveys- $9268 | |
| Reports/Publications- $100 | |
| Transportation- $1175 | |
| Meals- $1215 | |
| Airfare- $982 | |

**Lockbox Remittance To:**
L.E.K. Consulting
P.O. Box 845288
Boston, MA 02284-5288 (USA)

**Wire Remittance To:**
L.E.K. Consulting
Bank: Citizens Bank (USA)
ABA: 011500120
SWIFT Code: CTZIUS33
Account: 1107419244

| Total Amount USD | 208,175.00 |
|---|---|

Authorized by:

_Leigham Thibeault_

Leigham Thibeault

**Payment Terms:**
All invoices are payable within terms referenced above.
Undisputed invoices that remain unpaid after those
terms will be charged an interest rate of 18% per annum.



**LECLAIRRYAN**

A Virginia Professional Corporation
P.O. Box 2499
Richmond, Virginia 23218-2499

EIN NO: 41-2252451

Great Point Partners, LLC
165 Mason Street, 3rd Floor
Greenwich CONNECTICUT 06830

July 21, 2010
File Number: 25010.0001
Invoice No: ******

Matter: General Corporate

## CURRENT BILLING THROUGH JULY 20, 2010

| | |
|---|---:|
| Fees for Professional Services | $11,225.00 |
| Expenses and Advances | $4.50 |
| Costs Incurred not Advanced | $0.00 |
| Less Payments Applied | $0.00 |
| **CURRENT BILL** | **$11,229.50** |
| Previous Balance Due | $5,629.41 |
| Payments/Adjustments | $0.00 |
| **TOTAL BALANCE DUE** | **$16,858.91** |
| **MONIES HELD IN TRUST** | **$0.00** |



**E N V I R O N**
Princeton, New Jersey 08540
Tel: 609.452.9000  Fax: 609.452.0284
*See remittance instructions below.*

# INVOICE

Charles Myers
Great Point Partners, LLC
165 Mason Street
3rd Floor
Greenwich, CT 06830

| | |
|---|---|
| Invoice Date : | 6/17/2010 |
| Invoice Number : | 282406 |
| Project Number : | 0224884A |
| FEIN : | 52-1248616 |

**Regarding :     GPP: MediaTech, Inc.**
**0224884A**

Month of Service:  May 2010

Attached is a description of services performed.

**Professional Services :**

| | | |
|---|---|---|
| Principal 11 | 4.30 | Hours |
| Associate 6 | 11.50 | Hours |
| Support | 1.40 | Hours |

**Subtotal :**                                           **$2,654.00**

**Other Direct Costs :**

| | |
|---|---|
| Communication & Reproduction (3%) | 79.62 |
| Computer (3%) | 79.62 |
| INFORMATION SEARCH | 1,199.73 |

**Subtotal :**                                           **$1,358.97**

**Total:**                                           **$4,012.97**

**PAYMENT DUE WITHIN 30 DAYS OF RECEIPT**

*Remit To:*     *By Wire or ACH:*
ENVIRON International Corporation
At Wachovia Bank N.A.
ABA Routing # Wire: 031201467 or ACH: 031000503
Credit Account #2000200146885
SWIFT Code: PNBPUS33
Confirmation # 800-735-3320.  *Please reference invoice number.*

*By Regular Mail:*
ENVIRON International Corporation
P.O. Box 8500-1980
Philadelphia, PA 19178-1980

Tax ID # 521248616



**GRYPHON**
**INVESTIGATIONS**
ONE NORTH BROADWAY, SUITE 602
WHITE PLAINS, NY 10601

GREAT POINT PARTNERS, LLC
165 MASON STREET, 3RD FLOOR
GREENWICH, CT 06830
ATTN: STEVEN J. WEAVER

**Date:** 7/15/2010

**Invoice #:** 20500

**Terms:** Net 30

**Fed Tax ID#:** 13-3886621

## INVOICE

**In Reference To:**   MEDIATECH

| DESCRIPTION | Hours | Amount |
|---|---|---|
| INVESTIGATIVE SERVICES $195.00 | 9.2 | 1,794.00 |
| INVESTIGATIVE SERVICES $250.00 | 3.1 | 775.00 |
| INVESTIGATIVE SERVICES $295.00 | 2 | 590.00 |
| Subtotal | | 3,159.00 |
| ADMINISTRATIVE FEE (5%) | | 157.95 |
| DATA BASE SEARCHES | | 264.00 |
| ON-SITE SEARCHES | | 165.00 |

**Total**      $3,745.95



**Lockton Companies, LLC**
7 Times Square Tower Ste. 3802
New York, NY 10036
Phone : 646-572-7300    646-871-7300

| INVOICE #    816277 | | Page 1 |
|---|---|---|
| ACCOUNT NO.           FOR | DATE | |
| GREPA01          9T | 07/16/10 | |
| Risk Management Fee | | |
| POLICY # | | |
| **DUE DILIGENCE FEE** | | |
| COMPANY | | |
| **Risk Management Fee** | | |
| EFFECTIVE        EXPIRATION | BALANCE DUE ON | |
| 01/11/10       01/11/11 | 07/16/10 | |
| AMOUNT PAID | AMOUNT DUE | |
| | $        15,000.00 | |

**Great Point Partners**
**Adam Dolder**
165 Mason Street, 3rd Floor
Greenwich, CT 06830

| Item #  | Eff Date | Trn | Description | | Amount |
|---|---|---|---|---|---|
| INVOICE #   816277 | | | | | |
| 9B2SN2 | 07/16/10 | AFE | Due Diligence Fee | $ | 15,000.00 |
| | | | **Invoice Balance:** | $ | 15,000.00 |

Please remit payment to Lockton Companies, LLC,
c/o Bank of America, PO Box 3207, Boston MA 02241-3207



| INVOICE DATE: | 5/10/2010 |
|---|---|
| INVOICE #: | 6488 |
| PROJECT NAME: | GPP.SOW2010-02 |
| DUE DATE: | 6/9/2010 |
| P.O. #: | |

| SUMMARY INVOICE FOR: | REMIT PAYMENT TO: |
|---|---|
| Great Point Partners, LLC<br>Attn: Charles Myers<br>165 Mason Street, 3rd floor<br>Greenwich, CT 06830 | AccuReg, Inc.<br><br>Attn: Andrea Milonas<br><br>4400 SW 95th Ave.<br>Davie, FL  33328 |

| ITEM | ITEM DESCRIPTION | AMOUNT |
|---|---|---|
| Service Billable | Billable Consulting Services: April 1-30, 2010 | 18,825.00 |
| | **TOTAL PAYMENT DUE:** | $18,825.00 |

If you wish to make an electronic payment directly into our account please use the following:
Routing #: 067006432
Account #: 2090002667527


BIOREGULATORY & COMPLIANCE ASSOCIATES

| INVOICE DATE: | 5/19/2010 |
|---|---|
| INVOICE #: | 6519 |
| PROJECT NAME: | GPP.SOW2010-02 |
| DUE DATE: | 6/18/2010 |
| P.O. #: | |

| SUMMARY INVOICE FOR: | REMIT PAYMENT TO: |
|---|---|
| Great Point Partners, LLC<br>Attn: Charles Myers<br>165 Mason Street, 3rd floor<br>Greenwich, CT 06830 | AccuReg, Inc.<br><br>Attn: Andrea Milonas<br><br>4400 SW 95th Ave.<br>Davie, FL  33328 |

| ITEM | ITEM DESCRIPTION | AMOUNT |
|---|---|---|
| Service Billable<br>Expense<br>Expense | Consulting Services:  May 1-15, 2010<br>Expenses:  PJ Babaoglu: April 27-30, 2010<br>Expenses: LJ Silvestri: April 27-30, 2010 | 4,525.00<br>1,138.95<br>1,039.46 |
| | **TOTAL PAYMENT DUE:** | $6,703.41 |



| INVOICE DATE: | 6/14/2010 |
|---|---|
| INVOICE #: | 6556 |
| PROJECT NAME: | GPP.SOW2010-02 |
| DUE DATE: | 7/14/2010 |
| P.O. #: | |

| SUMMARY INVOICE FOR: | REMIT PAYMENT TO: |
|---|---|
| Great Point Partners, LLC<br>Attn: Charles Myers<br>165 Mason Street, 3rd floor<br>Greenwich, CT 06830 | AccuReg, Inc. |
| | Attn: Andrea Milonas |
| | 4400 SW 95th Ave.<br>Davie, FL   33328 |

| ITEM | ITEM DESCRIPTION | AMOUNT |
|---|---|---|
| Service Billable<br>Expense | Billable Consulting Services: May 16-31, 2010<br>Conference Calls: April 2010 | 1,050.00<br>16.50 |
| | **TOTAL PAYMENT DUE:** | $1,066.50 |

# C.V.M. Advisory, LLC

July 15, 2010

Mr. Adam Dolder
Managing Director
Great Point Partners, LLC
165 Mason St., 3rd Floor
Greenwich, CT 06830

Dear Adam:

Per our engagement letters dated February 1, 2010 and March 13, 2010, please find attached an invoice for the total amount for services rendered by CVM Advisory LLC.

Regards,

Charles Myers
C.V.M. Advisory, LLC

11 E 1st. St. Apt 810
New York, New York 10003
Phone: 917.613.4848

# C.V.M. ADVISORY, LLC

| Invoice Date: | 7/15/2010 |
|---|---|
| Project Name: | Project Mogul |

| Summary Invoice For: | Remit Payment To: |
|---|---|
| Mr. Adam Dolder<br>Managing Director<br>Great Point Partners, LLC<br>165 Mason St., 3rd Floor<br>Greenwich, CT 06830 | CVM Advisory, LLC<br>via wire:<br>ABA: 021000021<br>Acct: 555164649165 |

| Item: | Description: | Amount: | |
|---|---|---|---|
| Private Equity Execution Advisory | Billable Days, 2/1/10 - 5/28/10 | $ | 87,500 |
| Expenses | T&E | $ | 1,434 |
| | | | |
| | Total Due | $ | 88,934 |

9:21 AM
07/14/10
Accrual Basis

**Great Point Partners, LLC**
**Transactions by Account**
As of July 14, 2010

| Type | Date | Num | Name | Memo | Split | Amount |
|------|------|-----|------|------|-------|--------|
| **Related party transactions** | | | | | | |
| **Due from MediaTech** | | | | | | |
| Check | 04/29/2010 | 1986 | Partridge Advisors LLC | Invoice # 3 | Silicon Valley Checking | 20,000.00 |
| Employee Expense Reim | 04/30/2010 | EmAd100430 | | Employee expense allocation - 20100415 | Due from BMVF, LP | 827.48 |
| Employee Expense Reim | 04/30/2010 | EmAd100430 | | Employee Expense allocation - 20100430 | Due from BMVF, LP | 7,374.86 |
| Check | 05/07/2010 | EFT | American Express | AmEx Expense allocation - 20100504 | Silicon Valley Checking | 3,048.71 |
| Check | 05/10/2010 | EFT | Charles Myers | Consulting expenses on Mediatech | Silicon Valley Checking | 1,037.48 |
| Check | 05/26/2010 | 2014 | Hoyt Livery, Inc. | Inv 5841 dtd 5/4/10 | Silicon Valley Checking | 266.00 |
| Employee Expense Reim | 05/31/2010 | EmAd100531 | | Allocate employee expense reports - 20100531 | Due from BMVF, LP | 580.90 |
| Employee Expense Reim | 05/31/2010 | EmAd100531 | | Allocate employee expense reports - 20100516 | Due from BMVF, LP | 4,266.96 |
| Check | 06/02/2010 | 2029 | Hoyt Livery, Inc. | Invif 5925 - June 2010 | Silicon Valley Checking | 822.93 |
| Check | 06/03/2010 | EFT | American Express | AmEx Expense allocation - May 2010 Bill | Silicon Valley Checking | 988.92 |
| Check | 06/28/2010 | 2037 | Lecairjnen | File # 250100.0001 - Invoice # 378648 | Silicon Valley Checking | 5,512.50 |
| Employee Expense Reim | 06/28/2010 | EmpAd06301 | | Allocate employee expense reports - 20100615 | Due from BMVF, LP | 843.33 |
| Employee Expense Reim | 07/15/2010 | EmpAd07151 | | Allocate employee expense reports - 20100715 | Due from BMVF, LP | 1,979.55 |
| **Total Due from MediaTech** | | | | | | 47,552.42 |

# FLETCHER SPAGHT, INC.

July 15, 2010

Charlie Myers
Great Point Partners, LLC
165 Mason St, 3rd Floor
Greenwish, CT  06830

Dear Charlie:

Per your request, Fletcher Spaght Ventures' expenses for our diligence on Mediatech come to a total of $7,774.  This includes travel, out of pocket expense and communication expenses.

Please let me know if you require any further information.

Best regards,

Molly Houk
Director